**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CRYSTAL LYNN MONTOYA,

      Plaintiff,

vs.                                                                                    No. 1:20-CV-01067-KRS

KILOLO KIJAKAZI, Acting Commissioner
of the Social Security Administration,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court upon Plaintiff Crystal Lynn Montoya's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 22), dated July 22, 2021, challenging the determination of the Commissioner of the Social Security Administration ("SSA") that Montoya is not entitled to disability insurance benefits or supplemental security income under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1381-83f. The Commissioner responded to Montoya's motion on October 20, 2021 (Doc. 26), and Montoya filed a reply brief on November 3, 2021 (Doc. 27). With the consent of the parties to conduct dispositive proceedings in this matter, *see* 28 U.S.C. § 636(c); FED. R. CIV. P. 73(b), the Court has considered the parties' filings and has thoroughly reviewed the administrative record. Having done so, the Court concludes that the Administrative Law Judge (ALJ) erred in her decision and will therefore GRANT Montoya's motion and remand this case back to the SSA for proceedings consistent with this opinion.

**I. PROCEDURAL POSTURE**

On July 9, 2018, Montoya filed an initial application for disability insurance benefits and supplemental security income. (*See* Administrative Record ("AR") at 75-76). Montoya alleged

that she had become disabled on March 31, 2018, due to attention deficit hyperactivity disorder (ADHD), concentration deficit, severe carpal tunnel syndrome, depression, anxiety, obsessive-compulsive disorder (OCD), bipolar disorder, back problems, and drug abuse. (*Id.* at 78, 88). Her application was denied at the initial level on November 8, 2018 (*id.* at 75-76), and at the reconsideration level on April 24, 2019 (*id.* at 135-36). Montoya requested a hearing (*see id.* at 165), which ALJ Lillian Richter conducted on April 14, 2020 (see *id.* at 37-74). Montoya was represented by counsel and testified at the hearing (*id.* at 45-70), as did a vocational expert (the "VE") (*id.* at 70-74).

On June 25, 2020, the ALJ issued her decision, finding that Montoya was not disabled under the relevant sections of the Social Security Act. (*Id.* at 15-29). Montoya requested that the Appeals Council review the ALJ's decision (*id.* at 270-73), and on August 17, 2020, the Appeals Council denied the request for review (*id.* at 1-3), which made the ALJ's decision the final decision of the Commissioner. On October 16, 2020, Montoya filed the complaint in this case seeking review of the Commissioner's decision. (Doc. 1).

## II.  LEGAL STANDARDS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining "whether substantial evidence supports the factual findings and whether the ALJ applied the correct legal standards." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016); *see also* 42 U.S.C. § 405(g). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *See, e.g.*, *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). Although a court must meticulously review the

entire record, it may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See, e.g.*, *id.* (quotation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted); *Langley*, 373 F.3d at 1118 (quotation omitted). Although this threshold is "not high," evidence is not substantial if it is "a mere scintilla," *Biestek*, 139 S. Ct. at 1154 (quotation omitted); "if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118; or if it "constitutes mere conclusion," *Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005) (quotation omitted). Thus, the Court must examine the record as a whole, "including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262. While an ALJ need not discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). "Failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984) (quotation omitted).

## B. Disability Framework

"Disability," as defined by the Social Security Act, is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v.*

*Thomas*, 540 U.S. 20, 24 (2003); *Wall v. Astrue*, 561 F.3d 1048, 1051-52 (10th Cir. 2009); 20 C.F.R. §§ 404.1520, 416.920. If a finding of disability or non-disability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of his impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that he is able to do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on his RFC, he is unable to perform the work he has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, he is capable of performing other jobs existing in significant numbers in the national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

### III. THE ALJ'S DETERMINATION

The ALJ reviewed Montoya's claim pursuant to the five-step sequential evaluation process. (AR at 16-18). First, the ALJ found that Montoya had not engaged in substantial gainful activity since her alleged onset date. (*See id.* at 18). The ALJ then found at step two that Montoya suffered from the following severe impairments: ADHD, a bilateral positive ulnar variance, major depressive disorder, OCD, post-traumatic stress disorder (PTSD), and obesity. (*See id.*). The ALJ also found that Montoya suffered from several nonsevere impairments and several non-medically determinable impairments. (*See id.* at 18-19).

At step three, the ALJ concluded that Montoya did not have an impairment or combination of impairments that met the criteria of listed impairments under Appendix 1 of the

4

SSA's regulations. (*See id.* at 19-22). In so holding, the ALJ concluded that Montoya possessed only moderate limitations in the four broad areas of mental functioning, meaning she did not satisfy the "paragraph B" criteria of sections 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.11 (neurodevelopmental disorders), and 12.15 (trauma- and stressor-related disorders) of Appendix 1. (*See id.*). The ALJ also determined that the "paragraph C" criteria of the applicable listings had not been satisfied. (*See id.*).

Proceeding to the next step, the ALJ reviewed the evidence of record, including medical opinions and evidence from treating and examining providers, prior administrative medical findings, and Montoya's own subjective symptom evidence. (*See id.* at 23-27). Having done so, the ALJ concluded that Montoya possessed an RFC to perform light work with certain exertional and nonexertional modifications. (*See id.* at 22). Based on this RFC, the ALJ found that Montoya was unable to perform any past relevant work. (*See id.* at 27).

Moving to step five, the ALJ determined that Montoya was able to perform other jobs existing in significant numbers in the national economy. (*See id.* at 27-28). The ALJ therefore concluded that Montoya's work was not precluded by her RFC and that she was not disabled. (*See id.* at 28).

## IV. DISCUSSION

Montoya challenges the ALJ's evaluation of her subjective symptom evidence (*see* Doc. 22 at 20-26), as well as the ALJ's assessment of statements provided by consultative examiner Amy DeBernardi, Psy.D. (*see id.* at 16-20).[1] Having reviewed the evidence of record, and having fully considered the parties' arguments, the Court concludes that remand is required to address errors at both stages of the ALJ's analysis.

---

[1] Montoya has abandoned her earlier argument (*see* Doc. 22 at 12-16) concerning the ALJ's handling of opinions provided with prior administrative medical findings by Joy Kelley, Ph.D. (*see* Doc. 27 at 2).

5

### A. Subjective Symptom Evidence

An ALJ's subjective symptom evaluations "warrant particular deference." *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2002).[2] Still, such "deference is not an absolute rule." *See Kellams v. Berryhill*, 696 F. App'x 909, 917 (10th Cir. 2017) (unpublished) (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993)).[3] An ALJ evaluating a claimant's subjective symptom evidence and other matters must discuss not only "the evidence supporting his decision," but also "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ also may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence," *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (quotation omitted), or "mischaracterize or downplay evidence to support her findings," *Bryant v. Comm'r, SSA*, 753 F. App'x 637, 641 (10th Cir. 2018) (unpublished) (citing *Talbot v. Heckler*, 814 F.2d 1456, 1463-64 (10th Cir. 1987)). Failure to follow these controlling legal standards is grounds for remand. *See, e.g.*, *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).

The assessment of subjective symptom evidence is a two-step process, requiring the ALJ to first determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce his alleged symptoms. *See* Social Security Ruling (SSR) 16-3p, 2017 WL 5180304, at *3 (Mar. 16, 2016).[4] If she so determines, the ALJ must then evaluate

---

[2] In 2016, SSA eliminated the use of the term "credibility" when describing a claimant's testimony to "clarify that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at *1 (superseding SS 96-7p). Older authorities that addressed a claimant's "credibility," *see, e.g.*, *White*, 287 F.3d at 910, are therefore construed as referring to an individual's subjective symptom evidence.

[3] The Court cites *Kellams*, other unpublished decisions of the Tenth Circuit, and the district court decisions referenced in this opinion for their persuasive value unless otherwise stated.

[4] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*,

the intensity and persistence of the claimant's symptoms and determine the extent to which his symptoms limit his ability to perform work-related activities. *See id.* at *4. At this stage, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.*; *see also id.* at *6-7 (elaborating on factors to consider); 20 C.F.R. § 404.1529(c) (same).[5]

Montoya alleges that the ALJ erred in multiple respects at the second step of this analysis. (*See* Doc. 22 at 20-26).[6] Because the ALJ did err in her review of Montoya's allegations that her symptoms negatively impact her ability to maintain punctuality and reliability in the workplace, the Court concludes that remand is required on that basis and that Montoya's additional allegations of error at this stage need not be addressed. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

Citing to both her own testimony and other aspects of the record, Montoya contends that the ALJ failed to adequately discuss her alleged "difficulty, due to her mental impairments, in being reliable and performing appropriately." (Doc. 22 at 24). With respect to reliable attendance and punctuality, Montoya testified that she was "late everyday" at her last wage-based job due to

---

493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; see also *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

[5] Although Montoya applied for benefits under both Title II and Title XVI, the Court cites only to the regulations promulgated under Title II and does not also cite to the parallel regulations under Title XVI.

[6] Though Montoya also cites the relevant test in terms of the three-step framework for addressing pain and other subjective symptoms discussed in *Luna v. Bowen*, 834 F.2d 161 (1987) (*see* Doc. 22 at 21), persuasive decisions have recognized that the *Luna* framework "is equivalent to the two-step process prescribed by the SSA for evaluating a claimant's statements about her pain and other symptoms." *See, e.g.*, *Chavira v. Kijakazi*, No. 20-cv-00563 GBW, 2022 WL 92781, at *3 (D.N.M. Jan. 10, 2022); *see also, e.g.*, *Brownrigg v. Berryhill*, 688 F. App'x 542, 546 (10th Cir. 2017) (unpublished) (noting that *Luna* analysis is consistent with SSA interpretation of agency regulations). In particular, the final steps of both the *Luna* analysis and the SSR 16-3p framework are effectively the same. *See Chavira*, 2022 WL 92781, at *4 (considering "*Luna* step three (agency step two)").

her mental symptoms (*see* AR at 45-46, 49-50), that she lost the job due to lateness and tardiness (*see id.* at 57-58), and that she lost a potential job opportunity in 2017 because she was late to her interview (*see id.* at 50). Her allegations regarding a lack of punctuality and proper attendance are supported by her medical records, which regularly state that she missed or was "significantly late" for appointments. (*See id.* at 499) (October 2018 medical appointment); (*see also id.* at 516) (noting doctor's inability to see Montoya at March 2019 appointment "because you arrived late"); (*id.* at 543-44) (noting "3rd cancellation [by Montoya] of a BH screening"); (*id.* at 543) (noting Montoya eventually attended BH screening but was "[o]ver 45 minutes late to appointment"); (*id.* at 545) (same as to July 2019 psychiatric appointment); (*id.* at 619) (recording that Montoya "arrived too late to be seen" for scheduled January 2020 appointment).

      Montoya also attested that her symptoms affected her reliability in other ways. She testified to multiple conflicts with colleagues and supervisors who would "try[] to tell me how to do my job" at her most recent workplace. (*See* AR at 45-46, 57). She also alleged that her OCD symptoms would slow her down in a hypothetical job picking peanuts out of tubes because she would "have to go back and do everything I do because of my disorder," that she would "want to recount them and recount them," and that she "think[s] something bad is going to happen to me, like I'm going to die if I don't [do] that." (*See id.* at 48-49). Consistent with this testimony, Montoya informed providers that she is often unable to focus on responsibilities, including care for her son, because "[s]he gets obsessively cleaning or counting." (*See id.* at 553); (*see also id.* at 583) (noting "struggles to join son on school field trips" due to symptoms). She also told one provider that these reliability problems date back to her years in school, where she "would get distracted from paperwork" and could not focus on reading or mathematics. (*See id.* at 535).

8

Aside from an oblique reference to problems being "distractible" on "some occasions" (*see* AR at 24), the ALJ did not address Montoya's subjective symptom statements concerning her punctuality and other issues that allegedly affect her ability to reliably perform activities within a schedule. This omission is especially notable given that the ALJ not only extensively questioned Montoya about these issues at the hearing (*see id.* at 45-50, 54-55), she also posed hypothetical questions to the VE relating to Montoya's punctuality and reliability allegations and learned that such matters, if true, would likely affect Montoya's ability to maintain employment:

> Q Okay. Back to, my first hypothetical, if the individual was tardy let's say three times a month, would that affect competitive employment?
>
> A Your Honor, she'd be, that person would be fired shortly.
>
> Q And striking that restriction and instead substituting a restriction that the individual may be unable to respond appropriately to supervisors or coworkers. Would that affect competitive employment?
>
> A Your Honor, depending on serious this inappropriateness was it could lead to immediate firing right then.

(*Id.* at 71-72).

While the ALJ was not bound to formulate an RFC that followed the contours of any one hypothetical question posed at the hearing, this exchange highlights that Montoya's allegations regarding punctuality and reliability were consequential, both as to the formulation of her RFC and as to the ultimate issue of her alleged disability. In other words, those allegations were "significantly probative evidence" pertaining to Montoya's disability claim. *See Clifton*, 79 F.3d at 1010. Therefore, the ALJ's failure to address these allegations when assessing Montoya's subjective symptom evidence amounted to a failure to follow controlling legal standards. *See id.*

Although the Commissioner does not directly address Montoya's arguments regarding the ALJ's failure to discuss her alleged reliability and punctuality difficulties, she suggests that any omissions did not amount to legal error because the ALJ was "not required to go factor-by-

factor through the evidence" when assessing Montoya's subjective symptom allegations. (*See* Doc. 26 at 13) (citing *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)). While this principle is correct in a general sense, an ALJ is required to discuss "the uncontroverted evidence [s]he chooses not to rely upon" and "significantly probative evidence [s]he rejects." *See Clifton*, 79 F.3d at 1010. As the ALJ's own questioning at the hearing makes clear, Montoya's allegations that the symptoms arising from her mental impairments impact her ability to perform reliably in the workplace—allegations that appear to find some support in the record—have the potential to significantly impact the outcome of her disability claim if they are to be credited. Though the questions of whether and to what extent those allegations *should* be credited or *should* impact Montoya's claim remain largely within the province of the ALJ, she must at least give proper indication that she considered them by "setting forth the specific evidence [s]he relies on" when evaluating the subjective symptom evidence. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012); *see also* SSR 16-3p, 2017 WL 5180304, at *6-7 (discussing ALJ's obligation to consider "an individual's statements about the intensity, persistence, and limiting effects of symptoms" as well as relevant evidence from medical sources). The ALJ's failure to discuss Montoya's probative allegations regarding punctuality and reliability, let alone to explain whether and to what degree they were consistent with the medical evidence and other evidence in the record, does not conform to these requirements.

      On remand, the ALJ should make clear her consideration of Montoya's allegations regarding the alleged impact of her mental impairments and associated symptoms on her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, or otherwise reliably perform work-related activities. *See, e.g.*, SSR 16-3p, 2017 WL 5180304, at *6-8. If the ALJ finds that the record as a whole is inconsistent with

Montoya's allegations concerning the intensity, persistence, and limiting effects of her symptoms in this respect, she should explain why this is the case, citing to any significantly probative evidence that she nonetheless rejects. *See, e.g.*, *Clifton*, 79 F.3d at 1010. Conversely, if the ALJ finds that the record is in any way consistent with Montoya's allegations but that the resulting RFC accounts for these issues, she should explain this reasoning as well.

### B.  Evidence from Dr. DeBernardi

Dr. DeBernardi conducted a consultative mental evaluation of Montoya on April 5, 2019. (*See* AR at 502-06). In the course of this evaluation, Dr. DeBernardi reviewed Montoya's alleged history of symptoms and impairments, her mental status, and her functional information. (*See id.*). After providing a diagnosis of Montoya's impairments and addressing her prognosis and capacity to manage funds, Dr. DeBernardi provided the following statement under the heading "Functional Assessment":

> The claimant appears to have the clear ability to reason and understand. Remote and recent memories are generally intact. Immediate memory is fair. Sustained concentration and persistence are poor. She described support from her grandmother, but has few other social outlets. Adaptive skills and ability to tolerate stress are limited.
>
> Claimant is currently presenting with depression, anxiety, and anger management programs [*sic*]. These issues would be very likely to impact her ability to be a dependable employee, to tolerate changes in the work environment, or to form appropriate relationships with co-workers, supervisors, or the general public.

(*Id.* at 505-06). Upon reviewing these statements, the ALJ deemed them "largely unpersuasive" due to vagueness and inconsistency with the record. (*See id.* at 26).

Montoya claims that the ALJ erred in her assessment of Dr. DeBernardi's statements. (*See* Doc. 22 at 16-20). In response, the Commissioner argues that the ALJ's findings as to Dr. DeBernardi's opinion evidence were legally sufficient and supported by substantial evidence; however, she also contends that some of Dr. DeBernardi's relevant statements were not opinion

evidence at all and were in fact "accounted for" in the RFC. (*See* Doc. 26 at 9-13). In her reply brief, Montoya maintains that the ALJ's findings of vagueness and inconsistency were not adequately explained or supported by the record. (*See* Doc. 27 at 2-7). While Montoya also rejects the Commissioner's position that certain of Dr. DeBernardi's statements do not constitute opinion evidence, she argues in the alternative that the ALJ failed to properly assess those statements in any event. (*See id.*).

Pursuant to recent revisions to SSA regulations, the agency "will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in [the] case record." *See* 20 C.F.R. § 404.1520c(b). These regulations impose three "articulation requirements" when an ALJ considers medical opinion evidence. *See id.* First, "when a medical source provides multiple medical opinion(s)," the ALJ need not articulate how she considered each individual medical opinion; rather, the ALJ "will articulate how [she] considered the medical opinions . . . from that medical source together in a single analysis." *Id.* § 404.1520c(b)(1). Second, while an ALJ must consider five factors when evaluating medical opinion evidence, *see id.* § 404.1520c(c)(1)-(5), she is generally only required to articulate her consideration of two of those factors: "[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions . . . in your determination or decision." *Id.* § 404.1520c(b)(2). Finally, if differing medical opinions are equally well-supported and consistent with the record, the ALJ must then "articulate how [she] considered the other most persuasive factors . . . for those medical opinions." *Id.* § 404.1520c(b)(3). The revised regulations are explicitly intended to abrogate the rules formerly governing medical opinion evidence. *See, e.g.*, 82 Fed. Reg. 5844-01 at 5853-54 (Jan. 18, 2017).

Certain legal principles remain in force despite the new SSA regulations. As is true with respect to other aspects of her decision, the record must reflect that the ALJ "considered all of the evidence" when evaluating medical opinions, and she must discuss not just the evidence supporting her decision, but also "the uncontroverted evidence [s]he chooses not to rely upon" and "significantly probative evidence [s]he rejects." *See Clifton*, 79 F.3d at 1009-10. Further, the ALJ may not "mischaracterize or downplay evidence to support her findings," *Bryant*, 753 F. App'x at 641 (citation omitted), and she may not "pick and choose among medical reports, using portions of evidence favorable to [her] position while ignoring other evidence," *Carpenter*, 537 F.3d at 1265 (quotation omitted).

The ALJ determined that Dr. DeBernardi's opinions "generally do not" provide "good insight as to [Montoya's] functioning" because they are "vague and do not offer a clear vocationally relevant assessment of [her] functioning." (AR at 26). This determination was legally adequate and well-supported insofar as it pertained to Dr. DeBernardi's opinion that Montoya's medical conditions and symptoms "would be very likely to impact her ability" to function in a work environment. (*See id.* at 506). A blanket statement of this nature, without further concrete elaboration as to *how* and *to what extent* a claimant's conditions and symptoms were "likely" to "impact" her work-related activities, does not give the ALJ sufficient meaningful guidance in formulating an RFC that describes what the claimant can do despite her limitations. To the extent that this statement qualifies as a "medical opinion" at all, it "contain[s] too little information about [Montoya's] functional abilities and limitations to be of use." *See, e.g., Marissa H. v. Kijakazi*, No. 2:20-cv-00343-DAO, 2021 WL 3742461, at *3-4 (D. Utah Aug. 23, 2021) (finding similar vagueness issues with provider's statements that, *e.g.*, claimant's

impairments "negatively affect his 'ability to complete activities of daily living and vocational responsibilities'").

Dr. DeBernardi's other relevant statement—that Montoya has a "clear ability" to reason and understand, "intact" remote and recent memories, "fair" immediate memory, "poor" sustained concentration and persistence, and "limited" adaptive skills and stress tolerance (*see* AR at 505)—is another matter altogether. As the Commissioner implies (*see* Doc. 26 at 11), this statement does not itself constitute medical opinion evidence, as its contents do not describe "what [Montoya] can do despite [her] impairment(s)." *Cf.* 20 C.F.R. § 404.1513(a)(2). However, the Commissioner's suggestion that this statement instead consists of "objective findings" (*see* Doc. 26 at 11), which would mean that the statement amounts to "objective medical evidence," *see* 20 C.F.R. § 404.1513(a)(1), is not accurate, either.[7] Rather, this statement appears to be an assessment of the nature and severity of Montoya's impairments arising from the mental status examination and other findings recorded earlier in Dr. DeBernardi's report. (*See* AR at 504-05) (addressing, *e.g.*, memory, concentration and persistence, abstract thinking, and activities of daily living). In other words, as Montoya urges (albeit in the alternative) (*see* Doc. 27 at 4), Dr. DeBernardi's statement constitutes "other medical evidence" under the Commissioner's regulations. *See* 20 C.F.R. § 404.1513(a)(3) (defining term to include "judgments about the nature and severity of your impairments").

It does appear that the ALJ erroneously treated Dr. DeBernardi's other medical evidence as if it were medical opinion evidence. (*See* AR at 26) (discussing this evidence in the section of

---

[7] The terms "objective findings" and "objective medical evidence" are better applied to the findings recorded earlier in Dr. DeBernardi's report, such as the results of the mental status examination itself. (*See* AR at 504-05); *see also* 20 C.F.R. § 404.1513(a)(1) (defining "objective medical evidence" to include "medical signs, laboratory findings, or both"). Although that objective evidence may form the *foundation* of Dr. DeBernardi's "judgments about the nature and severity of [Montoya's] impairments," *see* 20 C.F.R. § 404.1513(a)(3), those judgments are not themselves objective evidence.

14

the decision devoted to evaluating opinion evidence, and introducing it by saying that Dr. DeBernardi "**opined**" as to Montoya's reasoning, memory, concentration, adaptive skills, and stress tolerance) (emphasis added). Such an error on its own is not necessarily harmful, so long as the ALJ followed the relevant guidelines when considering this non-opinion medical evidence. *See, e.g.*, *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (providing that ALJ error may be held harmless "where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way"). For instance, an ALJ must make findings about what the evidence shows; if the record has inconsistencies, the ALJ may still attempt to make findings as to whether a claimant is disabled, *see* 20 C.F.R. § 404.1520b(b), but she must "also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7 (July 2, 1996). Thus, as Montoya contends, the fact that certain medical evidence from Dr. DeBernardi did not constitute opinion evidence does not mean that the ALJ could simply disregard it without proper explanation. (*See* Doc. 27 at 4).

The Commissioner contends that, rather than rejecting or disregarding Dr. DeBernardi's other medical evidence, the ALJ actually *adopted* that evidence and incorporated it into the RFC. (*See* Doc. 26 at 4). The Court is not persuaded. Not only did the ALJ incorrectly discuss Dr. DeBernardi's other medical evidence as if it were opinion evidence, she then proceeded to conclude that this evidence (along with Dr. DeBernardi's opinion as to Montoya's ability to perform work-related activities) did not offer "good insight as to the claimant's functioning," and was therefore "largely unpersuasive," because it was "vague" and "d[id] not offer a clear vocationally relevant assessment." (*See* AR at 26). The ALJ also determined that some of this

15

evidence, specifically Dr. DeBernardi's judgment regarding Montoya's "poor" ability to sustain concentration and persistence (*see id.* at 505), was inconsistent with "the longitudinal evidence" concerning Montoya's "ability to remain on task" (*see id.*). The clear language used by the ALJ in evaluating Dr. DeBernardi's other medical evidence precludes a finding that she accepted and adopted that evidence.

The remaining question, then, is whether the ALJ followed controlling legal standards in effectively rejecting Dr. DeBernardi's medical judgments regarding the nature and severity of Montoya's impairments. The ALJ's first proffered reason for doing so, that those judgments were "vague" and not phrased in "vocationally relevant" terms, is not persuasive or supported by her decision. While there may be value in having medical *opinions* framed in vocationally relevant language since those are intended to measure "what [a claimant] can still do despite [her] impairment(s)," 20 C.F.R. § 404.1513(a)(2), ALJs generally do not struggle to ascribe meaning to other medical *evidence* using terms like "fair," "poor," "limited," and "intact" to describe the nature and severity of impairments. Indeed, the ALJ in this very case recounted and relied upon several examples of other medical evidence phrased in the same or similar terms. (*See, e.g.*, AR at 21) (considering medical evidence showing "poor" remote memory and fund of knowledge, "fair" fund of knowledge, and "intact" recent and remote memory at step three). The ALJ's determination that such terms are impermissibly "vague" when applied to evidence of this nature is contrary to her own handling of similar evidence and is otherwise belied by the language of the decision.

The ALJ's other proffered reason for rejecting Dr. DeBernardi's medical evidence was that it was inconsistent with the longitudinal evidence of record. (*Id.* at 26). In support of this finding, the ALJ cited Montoya's "ability to earn notable incoming by cleaning houses," which

she found to "suggest[] a greater ability to remain on task than Dr. DeBernardi appears to suggest." (*See id.*); (*see also id.* at 25) (noting that Montoya's activities and abilities, including cleaning houses, "indicate a higher level of mental functioning than alleged"). Certainly the ALJ was entitled to consider conflicting evidence and reach a resolution of that conflict based on the record before her. *See* 20 C.F.R. § 404.1520b(b)(1) (directing ALJ to consider relevant evidence to reach a disability determination in the event of inconsistencies); SSR 96-8p, 1996 WL 374184, at *7 (directing ALJ to explain resolution of material inconsistencies in evidence). However, as Montoya contends (*see* Doc. 22 at 19), the ALJ's reasoning falters due to an error the Court has already addressed: her failure to adequately discuss Montoya's subjective symptom evidence regarding the effect of her symptoms on her ability to work reliably and punctually.

When discussing her housecleaning work at the ALJ's hearing, Montoya cited problems with her hands as one reason that she quit performing that work. (*See* AR at 58). However, she further testified that her ability to remain on task in that job was limited by her OCD symptoms and that this limitation was also a significant factor in her decision to give up that work:

> Q Okay. And you said you stopped [cleaning homes] because of your hands?
>
> A Yeah. And they would --
>
> Q What treatment are you currently receiving?
>
> A I'd have to do it over and over and over, do things over and over and I just couldn't take it anymore. I can't, couldn't do it, but I really could, then I was barely, was barely getting by. I didn't have a choice --

(*Id.* at 59). The ALJ did not address this testimony in her decision. In other words, the ALJ's determination that Montoya's "ability to earn notable income by cleaning houses[] suggests a greater ability to remain on task" (*id.* at 26) entirely ignored the uncontroverted evidence that Montoya was *not* able to continue earning income from this job due to her *inability* to reliably remain on task as a result of her symptoms.

17

Because Montoya's testimony regarding the impact of her mental symptoms on her ability to reliably perform work-related activities was facially consistent with Dr. DeBernardi's judgment regarding Montoya's "poor" ability to sustain concentration and persistence, the ALJ's failure to address the testimony before rejecting Dr. DeBernardi's other medical evidence was legally erroneous. *See Clifton*, 79 F.3d at 1010. Moreover, the ALJ's error on this point—combined with her erroneous treatment of Dr. DeBernardi's other medical evidence as opinion evidence—does not leave the Court with the firm conviction that "no reasonable administrative factfinder . . . could have resolved the factual matter in any other way" had she assessed Dr. DeBernardi's other medical evidence properly. *See Allen*, 357 F.3d at 1145. Consequently, the ALJ's treatment of Dr. DeBernardi's other medical evidence as opinion evidence amounted to a legally harmful failure to follow controlling legal standards.

On remand, the ALJ need not reassess Dr. DeBernardi's medical opinion evidence—that is, the opinion that Montoya's issues "would be very likely to impact" her work-related activities. The ALJ's determination that this opinion was impermissibly vague was legally sound and supported by substantial evidence. However, the ALJ must ensure that Dr. DeBernardi's opinion evidence is distinguished from her non-opinion medical evidence, and she must appropriately apply SSA regulations, policies, and other controlling legal precedents when evaluating the latter. If the ALJ finds inconsistencies in the medical evidence, the ALJ will address that inconsistency in conformance with controlling legal standards, taking particular care to accurately characterize the record and to address any significantly probative evidence that is facially consistent with the rejected evidence.

## V. Conclusion

The ALJ erred in her review of Montoya's application for disability insurance benefits and supplemental security income by failing to properly evaluate Montoya's subjective symptom evidence and other medical evidence pursuant to controlling legal standards. Accordingly, Montoya's Motion to Reverse and Remand for a Rehearing (Doc. 22) is **GRANTED**, and the Court remands this case back to the SSA for proceedings consistent with this opinion.

_____
**KEVIN R. SWEAZEA**
**UNITED STATES MAGISTRATE JUDGE**